UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| GRANT MEDICAL CENTER, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 15-480 (RMC) |
| SYLVIA MATHEWS BURWELL, Secretary of Health and Human Services, | ) ) ) ) | |
| Defendant. | ) ) ) | |

**OPINION**

Plaintiff Hospitals blithely argue that the Secretary of Health and Human Services should ignore a decision of the Sixth Circuit Court of Appeals. The Hospitals challenge the Secretary's decision to comply with *Clark Regional Medical Center v. HHS*, 314 F.3d 241 (6th Cir. 2002), a decision concerning how to calculate hospital bed counts under 42 C.F.R. § 412.105(b). Bed counts substantially affect Medicare payments. The Hospitals insist that the Secretary should ignore *Clark* because it results in bed counts for (and payments to) hospitals located in the jurisdiction of the Sixth Circuit that are different from similar hospitals located elsewhere. Because the Secretary's decision to follow *Clark* was not arbitrary and capricious, the Hospitals' motion for summary judgment will be denied and the Secretary's cross motion will be granted.

1

# I. FACTS

## A. The Medicare Act

In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Act, 42 U.S.C. § 1395 *et seq.*, which provides for federal reimbursement for health care to the elderly and the disabled, *see* 42 U.S.C. § 1395c. Under Medicare Part A, the Secretary reimburses participating hospitals for care they provide to Medicare patients for "inpatient hospital services, post-hospital extended care services, home health services, and hospice care." *Id.* § 1395d(a). Medicare Part B, *id.* §§ 1395j-1395k, is a voluntary program that supplements Part A; it provides for reimbursement for, among other things, "hospital services . . . incident to physicians' services rendered to outpatients," *id.* §§ 1395k(a)(1), 1395x(s)(2)(b).

### 1. The Prospective Payment System and Bed Counts

Initially, Medicare reimbursed hospitals for the "reasonable costs" of providing Medicare services. Starting in 1983, Congress directed the Secretary to create an "inpatient prospective payment system" (IPPS), whereby the Secretary pays the hospital a fixed payment for each patient diagnosis at discharge, as described in 42 U.S.C. § 1395ww(d). *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1227 (D.C. Cir. 1994). IPPS depends on the patient's diagnosis. Diagnoses are assigned to a "diagnosis related group" (DRG), *see* 42 C.F.R. § 412.60, and each DRG is assigned a weight that is multiplied by a base dollar amount to determine payment, *see id.* § 412.64(g).[1] The rate is set in advance and is the amount commonly paid, no

---

[1] The majority of hospitals are paid the "federal rate," which is the product of the DRG times a base dollar "standardized" amount. 42 C.F.R. § 412.64(g). The standardized amount is roughly an average of operating costs per discharge of all patients for all IPPS hospitals in a given time period. 42 U.S.C. § 1395ww(d)(2)(C).

matter how much the hospital actually may spend on that patient.  *Methodist Hosp.*, 38 F.3d at 1227.  Because hospitals are paid a fixed rate, they are encouraged to minimize the cost of treatment.  *Id*.

Generally, Medicare Part A pays for inpatient hospital services.  To impose "cost limits" on reimbursement as required by statute, *see* 42 U.S.C. § 1395x(v)(1)(A), the Secretary classifies providers by bed type and count.  Identifying the type of hospital bed and counting such beds is critical to determining a providers' IPPS payment.

A small rural hospital can have "swing beds," which are beds that can change in reimbursement status.  When a swing bed is used for acute care, Medicare reimburses the hospital under IPPS.  When the patient "swings" from needing acute care to needing "post-acute skilled nursing facility care," the status of the bed changes and Medicare reimburses the hospital under skilled nursing facility policies. 42 U.S.C. § 1395tt; Medicare Program Proposed Changes to the Hospital IPPS & FY 2004 Rates, 68 Fed. Reg. 27154, 27205 (May 19, 2003).  Hospitals also can have "observation beds," where patients are not formally admitted to the hospital but they occupy a bed for short-term treatment and/or assessment in order to determine the patient's condition and whether s/he needs to be admitted as an inpatient.  68 Fed. Reg. at 27205.  When a hospital assigns a patient to an observation bed, Medicare reimburses the hospital under outpatient rules.  IPPS does not recognize observation bed-days as part of the hospital's inpatient operating costs.  *Id*.  If the hospital subsequently admits an observation patient as an inpatient, Medicare thereafter reimburses for services under Part A.  Medicare Program Changes to the Hospital IPPS for Acute Care Hospitals and FY 2010 Rates, 74 Fed. Reg. 43754, 43905 (Aug. 27, 2009).

Bed counts affect Medicare payments in different ways. Because hospitals that train medical residents incur higher operating costs, the Medicare Act provides an additional payment for teaching hospitals— the "indirect medical education" (IME) adjustment. 42 U.S.C. § 1395ww(d)(5)(B). The IME adjustment is calculated by multiplying a hospital's DRG revenue by a factor that in turn is calculated using the hospital's ratio of medical residents over beds. *Id.*; 42 C.F.R. § 412.105(a) & (b). Notably, the number of beds is a denominator in this ratio and thus, the per-student IME rises as the bed count falls and vice versa. In other words, a teaching hospital has an incentive to exclude beds from the total count because it would receive a larger IME payment with a smaller number of beds.

The bed count has the opposite effect on the "disproportionate share" (DSH) payment. Hospitals that serve a significantly disproportionate number of low income patients receive a supplemental payment, *i.e.*, the DSH adjustment, *see* 42 U.S.C. § 1395ww(d)(5)(F), because low income patients tend to be in poorer health and treatment costs are thus higher, *see Rye Psychiatric Hosp. Ctr., Inc. v. Shalala*, 52 F.3d 1163, 1171-72 (2d Cir. 1995). A hospital is eligible for DSH payments if it has a "disproportionate share percentage" amounting to: (1) 15% if the hospital has 100 or more beds; or (2) 40% if the hospital has fewer than 100 beds. 42 U.S.C. § 1395ww(d)(5)(F)(v).[2] The Secretary counts beds using the formula set forth in 42 C.F.R. § 412.105(b), and the DSH bed totals incorporate the formula for counting swing beds. *See* 42 C.F.R. § 412.106(a)(1)(i) (2004) (incorporating § 412.105(b) by reference). In contrast to the IME adjustment for teaching hospitals, the DSH adjustment is higher if the hospital in question has a larger bed count, at least to the 100-bed threshold. In other words, a hospital may

---

[2] The "disproportionate share percentage" is the sum of two fractions, described in § 1395ww(d)(5)(F)(vi).

have an incentive to include beds in the DSH calculation because this makes it easier to meet the low-income patient threshold and receive DSH payments.

### 2. Medicare Administration and the Notice of Program Reimbursement

The Centers for Medicare and Medicaid Services (CMS), an agency within the Department of Health and Human Services, administers Medicare. CMS contracts with private entities to process hospital claims. Such entities were known as "fiscal intermediaries," but starting in 2004, became known as "Medicare Administrative Contractors" (MACs). *See* 42 U.S.C. § 1395h. At the end of every fiscal year, each healthcare provider submits a cost report to its assigned MAC showing the hospital's costs and the portion allocated to Medicare. *See* 42 C.F.R. §§ 405.1801, 413/24(f), 424.13. The MAC reviews the report, determines hospital-specific adjustments, decides the total amount of Medicare reimbursement owed, and issues a Notice of Program Reimbursement specifying how much Medicare will reimburse for that year. 42 C.F.R. § 405.1803.

Within 180 days, a provider may appeal the determination of total reimbursement set forth in the Notice by filing an appeal with the Provider Reimbursement Review Board (PRRB). 42 U.S.C. § 1395oo(a)(3); 42 C.F.R. § 405.1835. PRRB decisions are final unless the Secretary reverses, affirms, or modifies the Board's decision within 60 days. 42 U.S.C. § 1395oo(f)(1). A hospital may seek judicial review of PRRB decisions in the federal district court where the hospital is located or in the federal district court in the District of Columbia. *Id*.

### 3. *Clark* and Bed Counting in the Sixth Circuit

In 2001, two Kentucky hospitals that provided Medicare services to low-income patients filed suit challenging the Secretary's interpretation of the bed counting provision, 42 C.F.R. § 412.105(b). *See Clark Regional Medical Center v. HHS*, 314 F.3d 241, 242 (6th Cir.

2002).  Because the Secretary excluded both swing bed and observation bed-days from the count of inpatient bed days, the total count of inpatient beds for each of the Kentucky hospitals was fewer than 100.  *Id*. at 244.  With such a low bed count, the hospitals were not eligible for a DSH adjustment despite their 15% disproportionate share.  Further, they could not meet the much higher 40% disproportionate share applicable to hospitals with fewer than 100 beds.  *Id*.  The hospitals argued that swing and observation beds should have been included in the count of inpatient bed days.  If those beds had been included, the hospitals would have had more than 100 beds and would have qualified for the DSH adjustment under the 15% provision.

        The hospitals objected to the Secretary's bed counting methodology, arguing that the regulation unambiguously required the Secretary to include swing and observation beds in the bed count for inpatient days.  *Id*. at 246.  The district court ruled in favor of the hospitals and the Sixth Circuit affirmed, finding that § 412.105(b) listed beds to be excluded from the court as only "beds or bassinets in the healthy newborn nursery, custodial care beds, or beds in excluded distinct part hospital units."[3]  *Id*. at 247.  "Because the regulation specifically lists certain types of beds that are excluded from the bed count, but does not list swing or observation beds, the plain meaning of the regulation suggests that it is permissible to count swing and observation beds."  *Id*.

---

[3] The version of § 412.105(b) that was then effective provided:

> (b) Determination of number of beds. For purposes of this section, the number of beds in a hospital is determined by counting the number of available bed days during the cost reporting period, not including beds or bassinets in the healthy newborn nursery, custodial care beds, or beds in excluded distinct part hospital units, and dividing that number by the number of days in the cost reporting period.

While the Secretary disagrees with *Clark*, she recognizes that *Clark* is binding in the Sixth Circuit. Accordingly, shortly after the *Clark* ruling, the Secretary published a notice of proposed rulemaking. 68 Fed. Reg. at 27202-05. The proposed new regulation excluded swing and observation beds from the count of inpatient beds. A few months later, the Secretary published the Final Rule amending § 412.105(b), effective October 1, 2003. *See* Medicare Program Changes to the Hospital IPPS and FY 2004 Rates, 68 Fed. Reg. 45346 (Aug. 1, 2003). The new version of § 412.105(b) superseded the regulation at issue in *Clark*.

In addition to the amended regulation, the Secretary issued a Joint Signature Memorandum (JSM) 109. JSM-109 provides that the Secretary will follow *Clark* only as to hospitals located in the jurisdiction of the Sixth Circuit and only for hospital discharges prior to the effective date of the new regulation, October 1, 2003. Administrative Record (AR) 232-34 (JSM-109). That is, under JSM-109, the bed counts for Sixth Circuit hospitals include swing and observation beds for cost years beginning prior to October 2003, and exclude swing and observation beds for bed counting thereafter.

The ten hospitals who are Plaintiffs here (collectively, Hospitals)[4] are acute care general hospitals located in Ohio, within the jurisdiction of the Sixth Circuit.[5] When calculating Medicare reimbursements for the Hospitals for fiscal years beginning prior to October 1, 2003, the MACs applied *Clark* in accordance with JSM-109, thereby counting swing and observation beds in total bed counts for the purpose of calculating both IME and DSH reimbursements, and they provided Notices of Program Reimbursement to the Hospitals. The Hospitals appealed their

---

[4] The Hospitals are: Grant Medical Center, Riverside Methodist Hospital, Doctor's Hospital, Western Reserve Care System, St. Elizabeth Health Center, St. Joseph Health Center, Kettering Memorial Hospital, Grandview Medical Center, Summa Health System, and Sycamore Hospital.

[5] The Sixth Circuit covers Ohio, Kentucky, Michigan, and Tennessee.

respective notices to the Provider Reimbursement Review Board (Board), and the Board consolidated the appeals.

The Hospitals argued that (1) the *Clark* decision bound only the parties to that case; and (2) the Secretary should retroactively apply revised § 412.105(b) to Sixth Circuit hospitals' cost years prior to October 1, 2003. The Board rejected these claims. AR [Dkt. 30] 6-17. The Board held that *Clark* was binding precedent in the Sixth Circuit prior to October 1, 2003, and that:

> [T]he separation of powers doctrine requires administrative agencies to follow the law of the circuit whose courts have jurisdiction over the cause of action. In the absence of a controlling decision by the Supreme Court, the respective courts of appeals express the laws of the circuit. As there is no controlling precedent by the Supreme Court addressing the issue in this case, the Board finds that the Intermediary is obligated to follow the relevant decisions of the Sixth Circuit in which the providers are located.

AR 15-16 (footnote omitted). CMS, on behalf of the Secretary, declined to review the Board's decision.

The Hospitals filed suit in this Court alleging: Count I, the Secretary violated the Administrative Procedure Act (APA), 5 U.S.C. § 706; and Count II, the Secretary violated the Hospitals' rights to equal protection under the Fifth Amendment. More specifically with regard to the APA claim, the Hospitals contend:

> [T]he Secretary's decision to treat the plaintiff Hospitals differently from similarly situated providers outside the Sixth Circuit is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; contrary to constitutional right, power, privilege or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or without observance of procedure required by law.

Compl. [Dkt. 1] ¶ 45.

The Hospitals filed a motion for summary judgment and the Secretary filed an opposition and cross motion. The matter is fully briefed. *See* Pl. Mot. for Summ. J. (MSJ) [Dkt. 22]; Def. Cross Mot. for Summ. J. Combined with Opp'n (XMSJ) [Dkts. 23, 24]; Pl. Opp'n Combined with Reply (Pl. Opp'n) [Dkts. 25, 26]; Def. Reply [Dkt. 29].

## II. LEGAL STANDARD

### A. Summary Judgment

Whether agency action is contrary to law under the APA is a legal question that courts resolve based on the entire administrative record. *See Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083-84 (D.C. Cir. 2001). Under the APA, an agency's role is to resolve factual issues to reach a decision supported by the administrative record, while "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citation omitted). Summary judgment is the mechanism for deciding whether an agency action was supported by the administrative record and was consistent with the APA standard of review. *Id.* (citing *Richards v. INS*, 554 F. 2d 1173, 1177 & n.28 (D.C. Cir. 1977)). Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

### B. APA Review

The Hospitals allege that the JSM-109 must be set aside because it is arbitrary, capricious and not in accordance with the law in violation of the APA. When reviewing an agency's interpretation of its enabling statute and the laws it administers, courts are guided by "the principles of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)." *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 754 (D.C. Cir. 2007).

9

*Chevron* sets forth a two-step inquiry. The initial question is whether "Congress has directly spoken to the precise question at issue" and, if so, the court must "give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. When the statute is clear, the text controls and no deference is extended to an agency's interpretation in conflict with the text. *Chase Bank USA, N.A. v. McCoy*, 563 U.S. 195, 210 (2011).

On the other hand, if a statute is ambiguous or silent on an issue, the court proceeds to the second step of the *Chevron* analysis and determines whether the agency's interpretation is based on a reasonable construction of the statute. *Chevron*, 467 U.S. at 843; *Sherley v. Sebelius*, 644 F.3d 388, 393-94 (D.C. Cir. 2011). As relevant here, Congress has not explicitly addressed the question of whether observation and swing bed should be counted to determine the total inpatient bed count. *See Health Alliance Hosp., Inc. v. Burwell*, 130 F. Supp. 3d 277, 289 (D.D.C. 2015). Accordingly, the Court must proceed to *Chevron* step two.

Under step two, a court determines the level of deference due to the agency's interpretation of the law it administers. *See Kempthorne*, 477 F.3d at 754. When the agency's interpretation is permissible and reasonable, it receives controlling weight, *id.*, "even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). "[T]he tremendous complexity of the Medicare program enhances the deference due the Secretary's decision." *Cmty. Care Found. v. Thompson*, 318 F.3d 219, 225 (D.C. Cir. 2003) (internal quotation marks omitted).

An agency's interpretation of the law it administers is permissible and reasonable if it is not arbitrary, capricious, or manifestly contrary to the statute. *Kempthorne*, 477 F.3d at 754. In determining whether an action was arbitrary and capricious, a reviewing court "must

consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks omitted). The scope of review under the arbitrary and capricious standard is narrow, and a court should not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency is "not required to choose the best solution, only a reasonable one." *Petal Gas Storage, LLC v. FERC*, 496 F.3d 695, 703 (D.C. Cir. 2007). *See also Odessa Reg'l Hosp. v. Leavitt*, 386 F. Supp. 2d 885, 891 (W.D. Tex. 2005) (42 C.F.R. § 412.105 is a permissible construction of the Medicare Act and passes the *Chevron* test; the question on APA review is whether the Secretary arbitrarily *applied* the regulation).

The Hospitals make much of the fact that the Secretary does not agree with *Clark* and that the Secretary's long-standing position, as reflected in bed count calculations before *Clark* and in the Final Rule amending § 412.105(b), has been to exclude swing and observation beds from the inpatient bed count. The relevant question presented, however, is not whether the Secretary agrees with *Clark*. She avowedly does not. *See* XMSJ at 8 ("Although the Secretary disagreed with the decision in *Clark*, she had no choice but to accept the Sixth Circuit's holding.") The question here is whether interpretive rule JSM-109—the Secretary's decision to apply *Clark* to all Sixth Circuit hospitals for fiscal years prior to October 2003—was an arbitrary and capricious interpretation of the Medicare Act. The Court finds that it was not.[6]

---

[6] JSM-109 is an interpretive rule. Interpretive rules receive such deference as is warranted by circumstances surrounding their creation, including "the degree of the agency's care, its consistency, formality, and relative expertness" and the "persuasiveness of the agency's position." *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 116-17 (D.D.C. 2011).

### III. ANALYSIS

**A. Agency Nonacquiescence**

The Hospitals argue that the Secretary should have engaged in "intracircuit nonacquiescence." They argue that because the Secretary is responsible for implementing Medicare uniformly and nationwide and because she disagrees with *Clark*, she should have refused to apply *Clark* to any other case.

The Hospitals fail to appreciate that the broad and clear holding of *Clark* *necessarily* applies to all hospitals in the Sixth Circuit. The Sixth Circuit held that the plain meaning of the prior regulation required the Secretary to include swing and observation beds when counting inpatient beds and, conversely, she had no authority to exclude such beds. *Clark*, 314 F.3d at 247. The opinion is unequivocal and leaves no wiggle room for arguing that it applied only to the particular parties in that case:

> We conclude that the Department's application of its own regulations in this case cannot be squared with either the plain meaning of the regulations or with the Department's definition of "available bed" set forth in PRM § 2405.3(G). As such, we conclude that the [ ] decision was arbitrary and capricious.
>
> The Department's attempt to distinguish between a "bed" and an "available bed day" is at odds with the plain meaning of § 412.105(b). Section 412.105(b) states that the number of beds is to be determined "by counting the number of available bed days during the cost reporting period, *not including beds or bassinets in the healthy newborn nursery, custodial care beds, or beds in excluded distinct part hospital units, and dividing that number by the number of days in the cost reporting period.*" 42 C.F.R. § 412.105(b) (emphasis added). Because the regulation specifically lists certain types of beds that are excluded from the bed count, but does not list swing or observation beds, the plain meaning of the regulation suggests that it is permissible to count swing and observation beds. Further, swing and observation beds are not of the same class or type as "beds or bassinets in the healthy newborn nursery, custodial care beds, or beds in excluded distinct part hospital units." Although these beds listed as excluded are . . . all

>    non-PPS reimbursable beds, the swing and observation beds at issue in this case are actually used for PPS-reimbursable services more often than not. None of the beds described as excluded may be used primarily for acute inpatient care as the swing and observation beds are. This is because these excluded beds are located in areas of the hospital that, by definition, cannot come within PPS. Had the Department intended to exclude all non-PPS reimbursable beds and services, it could easily have written the regulation to do so.

*Id*. at 247-48 (emphasis in original).

After the Sixth Circuit issued its *Clark* decision in February 2003, the Secretary's choices were limited: (1) she could file a writ of certiorari to the Supreme Court; (2) she could request that Congress pass a statute superseding *Clark*; or (3) she could amend the regulation and issue an interpretive memo specifying how she would treat Sixth Circuit cases until the amended regulation became effective. In the interest of expediency and facing the onset of a new fiscal year, the Secretary chose option three, amending the prior regulation and specifying through JSM-109 that *Clark* applied only in the Sixth Circuit and only for fiscal years prior to the effective date of the Final Rule that amended the regulation. The Final Rule was completed in time for it to be effective across the country at the start of the federal fiscal year beginning October 1, 2003.[7] This was a permissible and reasonable course of action, especially due to separation of powers principles and the criticism of agency nonacquiescence from the courts explained below.

The separation of powers doctrine requires administrative agencies to follow the law of the circuit with jurisdiction over a cause of action. *Yellow Taxi Co. of Minneapolis d/b/a*

---

[7] Seeking a writ of certiorari or a new statute would have taken substantially more time. "Catching Congress' ear . . . is more easily said than done; and given the huge volume of petitions for certiorari that flood the Supreme Court, it is often necessary to establish a split among the circuits before the Court will examine an issue." *Johnson v. U.S. R.R. Ret. Bd.*, 969 F.2d 1083, 1097 (D.C. Cir. 1992) (Buckley, J., concurring in part and dissenting in part).

*Suburban Yellow Taxi Co. v. NLRB*, 721 F.2d 366, 382 (D.C. Cir. 1983). "In the absence of a controlling decision by the Supreme Court, the respective courts of appeals express the law of the circuit." *Hyatt v. Heckler*, 807 F.2d 376, 379 (4th Cir. 1986). In *Yellow Taxi*, the D.C. Circuit rebuked the National Labor Relations Board which had "historically arrogated to themselves the authority to 'disagree' with judicial precedent." 721 F.2d at 382. The Circuit explained that agencies must abide by the superior power of the courts:

> [T]he Board is not a court nor is it equal to this court in matters of statutory interpretation. Thus, a disagreement by the NLRB with a decision of this court is simply an academic exercise that possesses no authoritative effect. It is in the court of appeals and not in an administrative agency that Congress has vested the power and authority to enforce orders of the NLRB. [National Labor Relations Act,] 29 U.S.C. § 160(e). It is in this court that Congress has vested the power to modify or set aside an order of the NLRB. [*Id.*] § 160(f). In 1803, Chief Justice John Marshall, speaking for a unanimous Court, concisely stated the fundamental principle on which we rely: "It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 (1803). Thus, it is in this court by virtue of its responsibility as the statutory court of review of NLRB orders that Congress has vested a superior power for the interpretation of the congressional mandate. Congress has not given to the NLRB the power or authority to disagree, respectfully or otherwise, with decisions of this court. See *Volkswagenwerk Aktiengesellschaft v. FMC,* 390 U.S. 261, 272, 88 S. Ct. 929, 935, 19 L. Ed.2d 1090 (1968). For the Board to predicate an order on its disagreement with this court's interpretation of a statute is for it to operate outside the law. Such an order will not be enforced.

*Yellow Taxi*, 721 F.2d at 382–83.

Agencies that have followed a policy of intracircuit nonacquiescence have been roundly "condemned" by every circuit that has addressed the issue. *Johnson v. U.S. R.R. Ret. Bd.*, 969 F.2d 1083, 1097 (D.C. Cir. 1992) (citing *Hyatt*, 807 F.2d at 379; *Stieberger v. Bowen,* 801 F.2d 29, 36–37 (2d Cir. 1986); *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984);

14

*Lopez v. Heckler,* 725 F.2d 1489, 1503 (9th Cir.), *vacated on other grounds and remanded,* 469 U.S. 1082 (1984); *Childress v. Secretary of HHS,* 679 F.2d 623, 630 (6th Cir. 1982)); *see also Jones & Laughlin Steel Corp. v. Marshall*, 636 F.2d 32, 33 (3d Cir. 1980); *Mary Thompson Hosp., Inc. v. NLRB*, 621 F.2d 858, 864 (7th Cir. 1980). "[F]lagrant disregard of judicial precedent must not continue. Not only is the [agency] obligated under the principles of *stare decisis* to follow this court's decision . . . , but it also owes deference to the other courts of appeals which have ruled on the issue." *Mary Thompson*, 621 F.2d at 864. It "raises grave constitutional and statutory questions" when an agency refuses to petition for Supreme Court review of an adverse circuit ruling and instead elects to continue to apply the rejected interpretation of an agency rule. *Johnson*, 969 F.2d at 1091; *see also id.* at 1092 (comparing nonacquiescence to Governor Orval Faubus' defiance of *Brown v. Bd. of Education*, 373 U.S. 493 (1954), at Little Rock) (citing *Lopez*, 725 F.2d. at 1497). In *Johnson*, the Circuit noted that the Secretary of Health and Human Services previously exercised a policy of intracircuit nonacquiescence, but abandoned this policy "after being severely criticized by the Courts and by Congress." *Johnson*, 969 F.2d at 1093.[8]

        In support of its claim that the Secretary should practice nonacquiescence here, the Hospitals cite *Atchison Topeka & Santa Fe Ry. v. Pena*, 44 F.3d 437 (7th Cir. 1994) and *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808 (D.C. Cir. 2002). *Atchison* and *Holland* do not

---

[8] In the early 1980s, the Secretary took the position that each Circuit ruling applied only to the parties in that case on the ground that the Social Security benefits program should be administered uniformly on a national basis. *See* H.R. Rep. 98-618 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3038, 1984 WL 37436, at *23-24 (Mar. 14, 1984). Congress debated the issue in the course of enacting the Social Security Disability Benefits Reform Act of 1984, Pub. l. No. 98-460, 98 Stat 1794. The Conference Committee urged agencies to follow a policy of nonacquiescense *only* where "the administration has initiated or has the reasonable expectation and intention of initiating the steps necessary to receive a review of the issue in the Supreme Court." Joint Conf. Comm. Statement, H.R. Conf. Rep. 98-1039, at *37 (1984).

apply. In those cases, the agency in question relied on a single circuit decision to create a new nationwide policy and gave no explanation for its policy change. *Atchison*, 44 F.3d at 440; *Holland*, 309 F.3d at 810. Here, the Secretary has followed a circuit decision in *only* the circuit that rendered it, and the Secretary provided, via JSM-109, a reasonable explanation of why she did so.[9]

Even if the Secretary might have chosen not to follow *Clark*, she was not *required* to make this choice. An agency is not required to choose the "best" solution, only a reasonable one. *Petal Gas*, 496 F.3d at 703. Choosing to issue JSM-109 was reasonable in light of strong prior criticism of intracircuit nonacquiescence by numerous circuit courts and Congress, *see Johnson* 969 F.2d at 1097, and in light of the conflicting policy concerns at issue. Hospitals around the country disagree about how beds should be counted. In contrast to the Hospitals' argument that *Clark* should be disregarded within the Sixth Circuit, other hospitals advocate for national application of the *Clark* decision. *See, e.g., Health Alliance Hosp., Inc. v. Burwell*, 130 F. Supp. 3d 277, 292-99 (D.D.C. 2015) (following *Clark* in determining the bed count at a Massachusetts hospital prior to October 2003); *Odessa Reg'l Hosp. v. Leavitt*, 386 F. Supp. 2d 885, 891-92 (W.D. Tex. 2005) (following *Clark* in determining the bed count at a Texas hospital for time periods before 2003). This is variation presumably is caused by the fact that including swing and observation beds in bed counts increases Medicare payments to some hospitals and decreases Medicare payments to others. The Secretary is in the best position to weigh the conflicting interests involved. *See Cmty. Care*, 318 F.3d at 225 (courts defer to the Secretary's

---

[9] The Hospitals also assert that *Holland* requires that no deference be given to the Secretary's decision here because her acquiescence to *Clark* is not a "reasoned judgment" where she openly disagrees. Pl. Opp'n at 4. But an agency that predicates action based on its disagreement with a court order acts outside the law. *Yellow Taxi*, 721 F.2d at 383.

policy choices in Medicare cases due to the tremendous complexity of the Medicare program). The Secretary's action in adopting JSM-109, and thereby applying *Clark* to hospitals located within the Sixth Circuit only, was not arbitrary and capricious.

The Hospitals further contend that the Secretary's decision to apply *Clark* in the Sixth Circuit was arbitrary and capricious because of the venue choice provision in the statute, 42 U.S.C. § 1395oo(f)(1). That provision allows a hospital to seek judicial review of PRRB decisions in the federal district court where the hospital is located or in the federal district court in the District of Columbia. The fact that a litigant has a choice where to file its appeal has no bearing on the analysis of whether the Secretary acted reasonably. A plaintiff may choose the venue for its APA challenge, but the Rule under review (here, JSM-109) is the same wherever the suit is filed.

### B. Retroactive Rulemaking

The Hospitals also argue that the Secretary should have applied the Final Rule retroactively within the Sixth Circuit. "The decision of whether to grant retroactive force to a newly promulgated agency rule is a question of law for the courts with no overriding obligation of deference to the agency decision." *Mason Gen. Hosp. v. Sec'y of HHS*, 809 F.2d 1220, 1224 (6th Cir. 1987). However, it is well-established that a regulation that changes legal rights adversely cannot be applied retroactively. *See Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 859 (D.C. Cir. 2002) (a rule cannot be applied retroactively where it "changes the legal landscape" by impairing vested rights, creating a new duty or obligation., or increasing a party's liability for past conduct) (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269-71 (1994)); *Georgetown Univ. Hosp. v. Bowen*, 821 F2d 750, 757 (D.C. Cir. 1987) (the APA does not authorize the Secretary to engage in retroactive rulemaking), *aff'd sub nom. Bowen v.*

*Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) (the Medicare Act does not authorize retroactive rulemaking). The Final Rule, amending 42 C.F.R. § 412.105(b), cannot be applied retroactively because it modified settled Sixth Circuit law established in *Clark*.

The Hospitals insist that the revisions to § 412.105(b) in the Final Rule were "clarifying amendments" that the Secretary can and should apply retroactively. The Hospitals argue that *Clark* did not "settle" the law, that in fact it "unsettled" the law, and the Secretary's amendment to § 412.105(b) should be given retroactive effect because it clarified the pre-existing regulation. Pl. Opp'n 17-18.

The Hospitals are correct that a clarifying amendment, which does not change the law, can be applied retroactively. The Secretary takes the position in all but the Sixth Circuit that the Final Rule amending § 412.105(b) merely clarified the law. *See* XMSJ at 25. In the Sixth Circuit, however, the Final Rule represents a substantive change because revised § 412.105(b) is inconsistent with *Clark*. "If a new regulation is substantively inconsistent with a prior regulation, prior agency practice, *or any Court of Appeals decision rejecting a prior regulation or agency practice*, it is retroactive as applied to pending claims." *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 860 (D.C. Cir. 2002) (emphasis added).

In their argument that the Secretary should apply the Final Rule retroactively, the Hospitals ignore the rules of *stare decisis*. *Clark* interpreted the "plain meaning" of the prior regulation, *see Clark*, 314 F.3d at 247, and thereby established precedent that is binding in the Sixth Circuit unless and until its ruling is overturned *en banc* or by the Supreme Court. *See Salmi v. Sec'y of HHS*, 774 F.2d 685, 689 (6th Cir. 1985) (the ruling of a circuit panel creates binding precedent in the circuit). *Clark* determined what the law was in the Sixth Circuit at the time, and the Secretary was obligated to follow it. *See Yellow Taxi*, 721 F.2d at 382 (an agency's

disagreement with a court decision "possesses no authoritative effect"). *Clark* established Sixth Circuit law, and the subsequent Final Rule amending § 412.105(b) as of October 2003, was in conflict with Sixth Circuit law prior to its effective date. As a matter of law, the Secretary had no authority to apply the Final Rule retroactively in the Sixth Circuit.

**C. Equal Protection**

The Hospitals claim that the Secretary violated their rights to equal protection by treating them differently from similarly situated hospitals, *i.e.*, by applying *Clark* and thus including swing and observation beds in finding their total bed count. To advance an equal protection claim, a plaintiff must assert facts that support the allegation that the government intentionally treated it differently from others who were similarly situated and that there is no rational basis for the difference in treatment. *3883 Connecticut LLC v. District of Columbia*, 336 F.3d 1068, 1075 (D.C. Cir. 2003) (citing *Village of Willowbrook v. Olech*, 529 U.S. 562, 564 (2000)). Equal protection "does not require that all persons everywhere be treated alike. Instead, it imposes the rather more modest requirement that government not treat similarly situated individuals differently without a rational basis." *Noble v. U.S. Parole Comm'n*, 194 F.3d 152, 154 (D.C. Cir. 1999) (citing *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)). In the face of an equal protection challenge, a court must uphold agency action if there was a rational basis for such action. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).

The Hospitals assert that the geographical location of the hospitals is an arbitrary basis for determining whether to apply *Clark* or the Final Rule. As explained above, however, the Secretary's decision to promulgate and apply JSM-109 was reasonable. The geographical boundaries that govern are those of the Sixth Circuit where *Clark* provided the relevant rule of law until the Final Rule became effective. The equal protection claim fails.

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs' motion for summary judgment [Dkt. 22] will be denied, and the Secretary's cross motion for summary judgment [Dkt. 23] will be granted. Judgment will be entered in favor of the Secretary. A memorializing Order accompanies this Opinion.

Date: September 1, 2016                                /s/
                                                       ROSEMARY M. COLLYER
                                                       United States District Judge